**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division**

_____

|  |  |
|---|---|
| **DAVID LEE BABCOCK,** | ) |
| | ) |
|    **Plaintiff,** | ) |
| | ) |
|    **v.** | )      **CIVIL NO. 3:10CV431** |
| | ) |
| **MICHAEL J. ASTRUE,** | ) |
| **Commissioner of Social Security,** | ) |
| | ) |
|    **Defendant.** | ) |

_____


## REPORT AND RECOMMENDATION OF THE MAGISTRATE JUDGE

This matter is before the Court for a report and recommendation pursuant to 28 U.S.C.

§ 636(b)(1)(B) on cross-motions for summary judgment.[1]  Plaintiff, David Lee Babcock, seeks

judicial review pursuant to 42 U.S.C. § 405(g) of the final decision of Defendant Commissioner

denying his applications for Social Security Disability ("DIB") and Supplemental Security

Income payments ("SSI").  The Commissioner's final decision is based on a finding by an

Administrative Law Judge ("ALJ") that Plaintiff was not disabled as defined by the Social

Security Act ("the Act") and applicable regulations.

For the reasons discussed herein, it is the Court's recommendation that Plaintiff's motion

for summary judgment (docket no. 9) be DENIED; that Defendant's motion for summary

---

[1] The administrative record in this case has been filed under seal, pursuant to Local Civil
Rules 5 and 7(C).  In accordance with these Rules, the Court will endeavor to exclude any
personal identifiers such as Plaintiff's social security number, the names of any minor children,
dates of birth (except for year of birth), and any financial account numbers from its consideration
of Plaintiff's arguments and will further restrict its discussion of Plaintiff's medical information
to only the extent necessary to properly analyze the case.

judgment (docket no. 13) be GRANTED; and that the final decision of the Commissioner be AFFIRMED.

## I. PROCEDURAL HISTORY

Plaintiff protectively filed for SSI and DIB in August of 2007, claiming disability due to heart problems, a "stint"[2], diabetes, high blood pressure, depression, anxiety, excessive weight, panic attacks, and high cholesterol, with an alleged onset date of September 3, 2002. (R. at 116, 120, 133, 137.) The Social Security Administration ("SSA") denied Plaintiff's claims initially and on reconsideration.[3] (R. at 73-82; 85-88.) On September 16, 2008, accompanied by counsel, Plaintiff testified before an ALJ. (R. at 22-53.) On October 1, 2008, the ALJ denied Plaintiff's application, finding that he was not disabled under the Act where, based on his age, education, work experience and residual functional capacity, there are jobs he could perform which exist in significant numbers in the national economy. (R. at 13-21.) The Appeals Council subsequently denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner subject to judicial review by this Court. (R. at 1-5.)

## II. QUESTION PRESENTED

Is the Commissioner's decision that Plaintiff is not entitled to benefits supported by substantial evidence on the record and the application of the correct legal standard?

---

[2] Plaintiff most likely refers to a "stent," which he received after suffering a myocardial infarction in September 2002. (R. at 196-97.) A stent is "a slender rodlike or threadlike device used to provide support for tubular structures that are being anastomosed, or to induce or maintain their patency." Dorland's Illustrated Medical Dictionary 1795 (31st ed. 2007).

[3] Initial and reconsideration reviews in Virginia are performed by an agency of the state government–the Disability Determination Services (DDS), a division of the Virginia Department of Rehabilitative Services–under arrangement with the SSA. 20 C.F.R. Part 404, Subpart Q; see also § 404.1503. Hearings before administrative law judges and subsequent proceedings are conducted by personnel of the federal SSA.

### III. STANDARD OF REVIEW

In reviewing the Commissioner's decision to deny benefits, the Court is limited to determining whether the Commissioner's decision was supported by substantial evidence on the record and whether the proper legal standards were applied in evaluating the evidence.  Johnson v. Barnhart, 434 F.3d 650, 653 (4th Cir. 2005); Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990).  Substantial evidence is more than a scintilla, less than a preponderance, and is the kind of relevant evidence a reasonable mind could accept as adequate to support a conclusion.  Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996) (citing Richardson v. Perales, 402 U.S. 389, 401 (1971); Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966)).

In order to find whether substantial evidence exists, the Court is required to examine the record as a whole, but it may not "'undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the Secretary.'"  Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001) (quoting Craig, 76 F.3d at 589).  In considering the decision of the Commissioner based on the record as a whole, the Court must "'take into account whatever in the record fairly detracts from its weight.'"  Breeden v. Weinberger, 493 F.2d 1002, 1007 (4th Cir. 1974) (quoting Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 488 (1951)).  The Commissioner's findings as to any fact, if the findings are supported by substantial evidence, are conclusive and must be affirmed.  Perales, 402 U.S. at 390.  While the standard is high, if the ALJ's determination is not supported by substantial evidence on the record, or if the ALJ has made an error of law, the district court must reverse the decision.  Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987).

A sequential evaluation of a claimant's work and medical history is required in order to determine if a claimant is eligible for benefits.  20 C.F.R. §§ 416.920, 404.1520; Mastro, 270

F.3d at 177. The analysis is conducted for the Commissioner by the ALJ, and it is that process that a court must examine on appeal to determine whether the correct legal standards were applied, and whether the resulting decision of the Commissioner is supported by substantial evidence on the record.

The first step in the sequence is to determine whether the claimant was working at the time of the application and, if so, whether the work constituted "substantial gainful activity" (SGA).[4] 20 C.F.R. §§ 416.920(b), 404.1520(b). If a claimant's work constitutes SGA, the analysis ends and the claimant must be found "not disabled," regardless of any medical condition. Id. If the claimant establishes that he did not engage in SGA, the second step of the analysis requires him to prove that he has "a severe impairment . . . or combination of impairments which significantly limit[s] [his] physical or mental ability to do basic work activities." 20 C.F.R. § 416.920(c); see also 20 C.F.R.404.1520(c). In order to qualify as a severe impairment that entitles one to benefits under the Act, it must cause more than a minimal effect on one's ability to function. 20 C.F.R. § 404.1520(c). At the third step, if the claimant has an impairment that meets or equals an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (listing of impairments) and lasts, or is expected to last, for twelve months or result in death, it constitutes a qualifying impairment and the analysis ends. 20 C.F.R. §§ 416.920(d), 404.1520(d). If the impairment does not meet or equal a listed impairment, then the evaluation proceeds to the fourth step in which the ALJ is required to determine whether the claimant can

---

[4] SGA is work that is both substantial and gainful as defined by the Agency in the C.F.R. Substantial work activity is "work activity that involves doing significant physical or mental activities. Your work may be substantial even if it is done on a part-time basis or if you do less, get paid less, or have less responsibility than when you worked before." 20 C.F.R. § 404.1572(a). Gainful work activity is work activity done for "pay or profit, whether or not a profit is realized." 20 C.F.R. § 404.1572(b). Taking care of oneself, performing household tasks or hobbies, therapy or school attendance, and the like, are not generally considered substantial gainful activities. 20 C.F.R. § 404.1572(c).

return to his past relevant work[5] based on an assessment of the claimant's residual functional capacity (RFC)[6] and the "physical and mental demands of work [the claimant] has done in the past." 20 C.F.R. §§ 416.920(e), 404.1520(e). If such work can be performed, then benefits will not be awarded. Id. However, if the claimant cannot perform his past work, the burden shifts to the Commissioner at the fifth step to show that, considering the claimant's age, education, work experience, and RFC, the claimant is capable of performing other work that is available in significant numbers in the national economy. 20 C.F.R. §§ 416.920(f), 404.1520(f); Powers v. Apfel, 207 F.3d 431, 436 (7th Cir. 2000) (citing Bowen v. Yuckert, 482 U.S. 137, 146, n.5 (1987)); Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). The Commissioner can carry his burden in the final step with the testimony of a vocational expert ("VE"). When a VE is called to testify, the ALJ's function is to pose hypothetical questions that accurately represent the claimant's RFC based on all evidence on record and a fair description of all the claimant's impairments so that the VE can offer testimony about any jobs existing in the national economy that the claimant can perform. Walker v. Bowen, 889 F.2d 47, 50 (4th Cir. 1989). Only when the hypothetical posed represents *all* of the claimant's substantiated impairments will the testimony of the VE be "relevant or helpful." Id. If the ALJ finds that the claimant is not capable

---

[5] Past relevant work is defined as SGA in the past fifteen years that lasted long enough for an individual to learn the basic job functions involved. 20 C.F.R. §§ 416.965(a), 404.1565(a).

[6] RFC is defined as "an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis. A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule." SSR-96-8p. When assessing the RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (i.e., 8 hours a day, 5 days a week, or an equivalent work schedule), and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record. Id. (footnote omitted).

of SGA, then the claimant is found to be disabled and is accordingly entitled to benefits. 20 C.F.R. §§ 416.920(f)(1), 404.1520(f)(1).

## IV. ANALYSIS

The ALJ found at step one that Plaintiff had not engaged in SGA since the alleged onset of his disability. (R. at 16.) At steps two and three, the ALJ found that Plaintiff had the severe impairments of obesity, degenerative disc disease of the lumbar spine, alcohol abuse, non-insulin dependent diabetes mellitus, and coronary artery disease status post-myocardial infarction and stenting, but that these impairments did not meet or equal any listing in 20 C.F.R. Part 404, Subpart P, Appendix 1, as required for the award of benefits at that stage. (R. at 16-17.) The ALJ next determined that Plaintiff had the RFC to perform light work, except that he could not work around hazards such as unprotected heights or dangerous/moving machinery due to his complaints of occasional dizziness. (R. at 17-20.) Furthermore, the ALJ concluded that Plaintiff could only occasionally crawl, climb, stoop, balance, squat, and kneel. (R. at 17-20.)

The ALJ then determined at step four of the analysis that Plaintiff could not perform his past relevant work as a press operator because of the level of exertion required. (R. at 20.) At step five, after considering Plaintiff's age, education, work experience, and RFC, the ALJ nevertheless found that there are other occupations which exist in significant numbers in the national economy that Plaintiff could perform. (R. at 20-21.) Accordingly, the ALJ concluded that Plaintiff was not disabled and was employable such that he was not entitled to benefits. (R. at 21.)

Plaintiff moves for a finding that he is entitled to benefits as a matter of law, or in the alternative, he seeks reversal and remand for additional administrative proceedings. (Pl.'s Mot. for Summ. J.) In support of his position, Plaintiff, who appears *pro se*, generally argues that the

ALJ erred in finding him not disabled.[7]  (Pl.'s Mem. in Supp. of Mot. for Summ. J. ("Pl.'s

Mem.") at 1-2 .)  Defendant argues in opposition that the Commissioner's final decision is

supported by substantial evidence and application of the correct legal standard such that it should

be affirmed.  (Def.'s Mot. for Summ. J. and Br. in Supp. Thereof ("Def.'s Mem.") at 14-20.)

      **A.**      **The ALJ's RFC analysis is supported by substantial evidence.**

Plaintiff's motion for summary judgment is actually a letter written by a third party,

Linda Goode, challenging various aspects of the ALJ's decision.  (Pl.'s Mem. at 1-2.)  To the

extent that the letter contains "new" evidence not previously in the record or considered by the

ALJ, the Court cannot consider such evidence.  The Court is limited in its review to only the

evidence of record that the ALJ had the opportunity to review and consider.  Smith v. Chater, 99

F.3d 635, 638 n.5 (4th Cir. 1996) (citing U.S. v. Carlo Bianchi & Co., 373 U.S. 709, 714-15

(1963); Huckabee v. Richardson, 468 F.2d 1380, 1381 (4th Cir. 1972) (citing Vitek v. Finch, 438

F.2d 1157 (4th Cir. 1970) (noting that reviewing courts are restricted to the administrative record

in determining whether the decision is supported by substantial evidence).  The Court may only

consider newly submitted evidence if it is truly "new," meaning it was not previously available.

See 42 U.S.C. § 405(g); see also Borders v. Heckler, 777 F.2d 954, 955 (4th Cir. 1985).  Such is

not the case here.  Ms. Goode could have testified at the hearing before the ALJ, and, indeed, the

record contains a letter from her which was considered by the Appeals Council.  (R. at 184-86.)

The Appeals Council did not find that the letter was sufficient to overturn the ALJ's decisions.

Further, many of the allegations contained in the letter are also found in various parts of the

record; therefore, the Court notes that the majority of the allegations presented have been

---

[7] The Court also notes that Plaintiff raises an ineffective assistance of counsel argument in his motion.  (Pl.'s Mem. at 2.)  However, such an issue is not properly before the Court to resolve because the issue was not raised at the administrative level and, accordingly, it will not be addressed.

considered by the ALJ, and the letter contains no "new" evidence to justify a sentence six remand.

> ### a. Substantial evidence supports the ALJ's conclusion that Plaintiff's alleged depression and anxiety were not severe impairments.

One specific challenge asserted regards the ALJ's finding that Plaintiff's anxiety was not a severe impairment. (Pl.'s Mem. at 1.) Ms. Goode asserts that Plaintiff suffers from depression, that his anxiety worsened between 2003 and 2006, and that he continues to experience panic attacks. (Pl.'s Mem. at 1-2.) The Court accordingly addresses the ALJ's discussion of Plaintiff's severe impairments.

To be a severe impairment, the medical evidence must establish more than a slight abnormality or combination of such which would have more than a minimal effect on a claimant's ability to work. See 20 C.F.R. §§ 416.920(c), 404.1520(c). Further, the impairment must *significantly* limit a person's physical or mental ability to do basic work activities. SSR 85-28. The ALJ noted that although Plaintiff had a history of anxiety and had taken medications in the past, he had no other treatment for anxiety or any other psychologically-based symptoms. (R. at 16.) The ALJ also noted that the medical evidence supported a finding that Plaintiff's psychologically-based symptoms caused only mild restrictions in his activities of daily living and maintaining social function, and caused no deficiencies in his concentration and attention. (R. at 16.)

Indeed, the record demonstrates that Plaintiff lives alone; is independent in his activities of daily living; socializes with family and friends; can appropriately interact with the public; and had no problems with attention or concentration. (R. at 16, 28-29, 39, 42, 151-58.) The record does not contain evidence of episodes of decompensation. (R. at 16.) Plaintiff also testified that he has an unrestricted license and drives six to seven times a week; that Paxil medication helps

him sleep six to seven hours a night; that he does his own shopping, though his next-door mother prepares food for him; that he has no routine activities outside his home but does socialize; that he has had no psychiatric treatment since 2002; that he has no problems with memory, concentration, or sleeping; and that he experiences drowsiness when taking his medications, but had not mentioned such side effect to his physician. (R. at 29, 37-43.) Though Plaintiff reported in September 2007 that he suffered severe panic attacks daily, particularly when driving, he did not mention such episodes at the hearing before the ALJ. (R. at 137, 154, 157.) Plaintiff also reported in 2007 that he spent time with others four times a week and went fishing twenty times a year. (R. at 155.) He noted that he did not handle stress or changes in routine well, but there is no medical or other evidence corroborating such a statement. (R. at 157.)

A psychiatric review performed in November 2007 by state physician Donald Bruce indicates that Plaintiff suffered from depression, anxiety, and a panic disorder, but that such impairments caused only mild limitations. (R. at 222-34.) Dr. Bruce noted that he found Plaintiff partially credible. (R. at 222-34.) Other medical evidence of record indicates that Plaintiff generally complained of physical impairments and symptoms rather than psychological symptoms. There are a few instances of documented anxiety and complaints of panic attacks, though such complaints were alleged to have occurred several years prior in 2001 and 2002. (R. at 290-94.) At that time, Plaintiff reported that the medication Effexor had not helped control his anxiety, though in December 2002 he was "a lot less anxious." (R. at 290-92.) The next complaint of panic attacks and anxiety was not until July 2006, when Plaintiff alleged that he suffered from increasing symptoms of such and had difficulty sleeping, though he stated that the medication Paxil offered him some resolution of "a lot" of those symptoms. (R. at 278.) It was also noted at that visit that Plaintiff had been recently diagnosed with diabetes. (R. at 278.)

Plaintiff's last documented complaint to his physician of depression and anxiety was in September 2007. (R. at 254.) He stated during a consultative examination with Nancy Powell, M.D. in December 2007 that he had no hospitalizations and was not in therapy for depression or panic disorder. (R. at 248-52.)

Though the evidence demonstrates that Plaintiff did allege some psychologically-based symptoms, the evidence does not reflect that such symptoms caused anything more than mild limitations on his activities of daily living or relevant work-related abilities. Plaintiff was not in therapy for depression or anxiety. (R. at 248-52.) Though a letter from Plaintiff's nurse practitioner states that he is treated for chronic anxiety, it appears that the condition is well-controlled by medications. (R. at 317, 346.) Plaintiff also stated that Paxil relieved or helped many of his anxiety-related symptoms. (R. at 278.) Accordingly, substantial evidence supports the ALJ's decision that Plaintiff's alleged depression and anxiety did not constitute a severe impairment.

### b. The ALJ properly assessed the opinions of the treating physicians.

Plaintiff next argues that the ALJ erroneously disregarded the opinions of his treating physician. (Pl.'s Mem. at 1-2.) He states that the consultative examination administered by Dr. Powell was a "wasted trip" because it was not a thorough examination. (Pl.'s Mem. at 1.) Plaintiff also relies on a letter written by Nurse Clayton, which states that Dr. Powell's one-time examination did not take into account Plaintiff's seven year history. (Pl.'s Mem. at 1, R. at 345.) Plaintiff also asserts that Dr. Andrew Rose reviewed and signed the letters written by Nurse Clayton, and that such input should have been given substantial weight. (Pl.'s Mem. at 1-2.)

During the sequential analysis, when the ALJ determines whether the claimant has a medically-determinable severe impairment, or combination of impairments which would

significantly limit the claimant's physical or mental ability to do basic work activities, the ALJ must analyze the claimant's medical records that are provided and any medical evidence resulting from consultative examinations or medical expert evaluation that have been ordered. See 20 C.F.R. § 416.912(f). When the record contains a number of different medical opinions, including those from the Plaintiff's treating physician(s), consultative examiners or other sources that are consistent with each other, then the ALJ makes a determination based on that evidence. See 20 C.F.R. § 416.927(c)(2). If, however, the medical opinions are inconsistent internally with each other, or other evidence, the ALJ must evaluate the opinions and assign them respective weight to properly analyze the evidence involved. 20 C.F.R. § 416.927(c)(2), (d). Under the applicable regulations and case law, a treating physician's opinion must be given controlling weight if it is well-supported by medically-acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the record. Craig, 76 F.3d at 590; 20 C.F.R. § 416.927(d)(2); SSR 96-2p. However, the regulations do not require that the ALJ accept opinions from a treating physician in every situation, e.g., when the physician opines on the issue of whether the claimant is disabled for purposes of employment (an issue reserved for the Commissioner), or when the physician's opinion is inconsistent with other evidence, or when it is not otherwise well supported. Jarrells v. Barnhart, No. 7:04-CV-00411, 2005 WL 1000255, at *4 (W.D. Va. Apr. 26, 2005). See 20 C.F.R. § 404.1527(d)(3)-(4), (e).

The ALJ noted that no treating physician had expressed an opinion regarding Plaintiff's ability to perform work-related functions. (R. at 19.) The ALJ correctly stated that Nurse Clayton's[8] opinion that Plaintiff was disabled was not entitled to any probative weight, as the ultimate determination of disability is reserved to the Commissioner. (R. at 19; SSR 96-5p.)

---

[8] Even if the opinion was adopted by Dr. Rose, the ALJ was not required to afford such a conclusory opinion probative weight. SSR 96-5p.

The ALJ also noted that Nurse Clayton's opinions regarding Plaintiff's ability to perform work-related functions was assigned very little weight. (R. at 19, 318.)[9] The ALJ reasoned that Nurse Clayton's opinions appeared to be based on Plaintiff's self-reports rather than objective medical evidence. (R. at 19.) The ALJ noted overall that there was a "great lack" of objective medical evidence. (R. at 19.) The ALJ specifically took issue with Nurse Clayton's opinion that Plaintiff could not stand for more than ten minutes, stating that a July 2008 x-ray of his lumbar spine revealed very mild degenerative changes, and that there was otherwise no objective evidence to support such a limitation. (R. at 19, 327.)

Nurse Clayton opined that Plaintiff did not have the physical condition to do any kind of work, including sedentary or hand work, due to his lack of stamina and dexterity from diabetic complications of neuropathy as well as his current coronary status. (R. at 317.) Nurse Clayton also opined that Plaintiff was only able to sit fifteen to sixty minutes at a time; stand five to ten minutes; walk three hundred feet at a time; and that he must lie down for three to four hours a day. (R. at 318.) Nurse Clayton noted that Plaintiff had such limitations since 2006.[10] (R. at 318.) Nurse Clayton also noted that it was difficult to manage all of Plaintiff's medical problems. (R. at 317, 346.[11]) Further, in a letter signed by both Nurse Clayton and Dr. Rose, they noted that the "primary limiting factor" in providing a complete work-up of Plaintiff's degenerative changes was due to his lack of insurance coverage. (R. at 345.)

---

[9] The Court notes that the questionnaire regarding work-related functions was signed only by Nurse Clayton, and not Dr. Rose.

[10] The Court notes that Plaintiff's own nurse practitioner did not opine that he was disabled until 2006, some four years after the onset date he alleges.

[11] This same letter appears in the record twice. It is identical save for the addition of Dr. Andrew Rose's signature.

Plaintiff has alleged that his lack of medical treatment is directly related to his lack of finances and insurance. A lack of finances is a legitimate reason to not seek medical treatment, and cannot be considered in analyzing the claimant's allegations. See S.S.R. 82-59. If an individual is unable to afford a prescribed treatment that he or she is willing to undertake, and if free community resources (e.g., clinics, charitable and public assistance agencies, etc.) are not available, then the individual's failure to follow a prescribed treatment would not preclude a finding of disability. Id. However, the claimant must explore all possible resources, and contacts with such resources and the claimant's financial circumstances must be documented. Id.

Here, Ms. Goode noted in her letter that she encouraged Plaintiff to obtain a county card and enroll in a financial assistance program. (Pl.'s Mem. at 1-2, R. at 184.) Indeed, Ms. Goode stated that she contacted Plaintiff's physicians, advised them of Plaintiff's financial situation, and they, in turn, advised her to apply for assistance with a local assistance program. (R. at 184-86.) Plaintiff was accepted into the program, and qualified for a one hundred percent reduction. (R. at 184, 195.) After such acceptance, the record demonstrates that Plaintiff, apparently at the urging of Ms. Goode, did seek medical assistance more frequently. (R. at 184.) However, Ms. Goode now apparently suffers from her own health issues, stating that she cannot help Plaintiff anymore and "someone else" needs to. (R. at 186.)

While the Court recognizes Plaintiff's financial difficulties, it would be remiss to ignore the fact that once Plaintiff sought financial assistance for his medical problems, he received it. It is commendable that Ms. Goode helped Plaintiff obtain such resources, but it must be noted that Plaintiff could have sought those resources on his own beforehand. Therefore, his failure to obtain medical treatment cannot be due strictly to a lack of finances. Further, it is well-

documented that Plaintiff was an avid cigarette and alcohol abuser, which begs the question of how he afforded such items when he allegedly could not afford medical care.  (R. at 41-42, 196-99, 211-17, 220, 248-52, 254, 269, 281-82, 320, 322.)

Plaintiff's alcohol abuse may have also contributed to his poor blood pressure control. Cardiologist Dr. Mark E. Johns, M.D., noted that alcohol consumption and a weight problem can make it "quite difficult" to control blood pressure.  (R. at 220.)  Indeed, Dr. Johns noted on several occasions between 2002 and 2006 that Plaintiff needed to stop "binging" with alcohol; that the cigarettes "have to be stopped"; and that Plaintiff needed to lose weight.  (R. at 211-17.) He repeatedly referred to Plaintiff's "abuse" of cigarettes (of which Plaintiff smoked up to three packs a day) and alcohol, which contributed to his hypertension.  (R. at 196-97, 211-17.)  In 2005, treatment records from one of two visits that year indicate that Dr. Johns told Plaintiff that what he could do for himself was much better than what physicians could do with the adjustment of blood pressure medications.  (R. at 213.)  It was also noted that Plaintiff walked without difficulty.  (R. at 212.)  In 2006, Dr. Johns noted that Plaintiff was "binging" on weekends and still smoking at least two packs per day, but that he had no edema and was doing "okay" cardiac-wise.  (R. at 211.)

Other than the few visits to Dr. Johns between 2002 and 2006, there are but four visits to his primary care physician during that same time period.  (R. at 284, 290-93.)  In 2002, Plaintiff presented on three instances regarding his anxiety and was advised about diet and exercise.  (R. at 290-93.)  Plaintiff did not seek another consultation until 2004 for a follow-up regarding his hyperlipidemia.  (R. at 284.)  In March 2006, two years after his last visit, Plaintiff returned to his primary care physician.  (R. at 281-82.)  Nurse Clayton noted that Plaintiff's blood pressure vacillated up and down; that he had no chest pain, shortness of breath, extremity swelling or

edema, headaches, or vision changes; that he had no side effects with his medications; that he suffered from diabetes symptoms; that his cardio was regular; and that he smoked and drank. (R. at 281-82.) From 2006 to 2007, records indicate that Plaintiff's primary reason for treatment was the regulation of his blood pressure. (R. at 253-82.) During that time period, Plaintiff's blood pressure was well-controlled at some visits, but elevated at others. (R. at 253-82.) Plaintiff also continued to drink and smoke heavily, up to three packs per day, and was advised on more than one occasion about his need to diet and exercise. (R. at 254, 265, 269, 276, 281-82.) Plaintiff was also diagnosed with diabetes in 2006. (R. at 278.) In March 2008, treatment records indicate that Plaintiff's blood pressure remained elevated, and that he suffered from shortness of breath, yet he continued to smoke two packs of cigarettes per day. (R. at 322.) In July 2008, records indicate that Plaintiff's blood sugar levels were "horrible," he endured shortness of breath, a guarded gait, and his lungs were diminished throughout. (R. at 320.) During that same visit, it was noted that Plaintiff continued to smoke and "must get aggressive" about his diet, which was "very poor" and included candy and carbohydrates. (R. at 320.) That particular appointment appears to be the last treatment record in evidence.

It is clear from the medical evidence that Plaintiff suffers from hypertension and diabetes, both conditions fluctuating in how well they are controlled. However, it is also clear that Plaintiff's failure to follow multiple medical recommendations to cease smoking and drinking; exercise; maintain a better diet; and lose weight, contributed to the difficulty in the regulation of his impairments. Further, and as the ALJ noted, there is a lack of objective evidence with regard to his other alleged impairments, specifically any degenerative disc disease of Plaintiff's lumbar spine. While an x-ray in 2008 indicated degenerative changes at the lumbosacral junction of

Plaintiff's spine, there was no acute fracture indicated and five nonrib-bearing vertebral bodies were in normal alignment.  (R. at 327.)

Even though objective medical evidence was lacking, two state physicians opined that Plaintiff was capable of "medium" work, and Dr. Powell indicated that Plaintiff could lift fifty to one hundred pounds, the ALJ concluded that Plaintiff could only perform "light" work with some limitations.  (R. at 17-20, 248-52, 297-303, 312-14.)  Such a conclusion suggests that the ALJ did not fully credit Dr. Powell's examination, as Plaintiff appears to argue.  (Pl.'s Mem. at 1.)  In fact, the ALJ assigned Dr. Powell's opinion considerable weight, and he credited Plaintiff's allegations to some extent in finding him only capable of light work.  Therefore, because substantial evidence supports the ALJ's decision not to assign controlling weight to Nurse Clayton's opinion, the ALJ's decision should be affirmed.

> ### c.    Substantial evidence supports the ALJ's decision to find Plaintiff not entirely credible.

Plaintiff also appears to challenge the ALJ's credibility finding.  (Pl.'s Mem. at 2.)  After step three of the ALJ's sequential analysis, but before deciding whether a claimant can perform past relevant work at step four, the ALJ must determine the claimant's RFC.  20 C.F.R. §§ 416.920(e)-(f), 416.945(5)(1).  The RFC must incorporate impairments supported by the objective medical evidence in the record and those impairments that are based on the claimant's credible complaints.  In evaluating a claimant's subjective symptoms, the ALJ must follow a two-step analysis.  Craig v. Charter, 76 F.3d 585, 594 (4th Cir. 1996); see also SSR 96-7p; 20 C.F.R. §§ 404.1529(a) and 416.929(a).  The first step is to determine whether there is an underlying medically determinable physical or mental impairment or impairments that reasonably could produce the individual's pain or other related symptoms.  Id.; SSR 96-7p, at 1-3.  The ALJ must consider all the medical evidence in the record.  Craig, 76 F.3d at 594-95; SSR

96-7p, at 5, n.3; see also SSR 96-8p, at 13 (specifically stating that the "RFC assessment must be based on *all* of the relevant evidence in the case record") (emphasis added).  If the underlying impairment reasonably could be expected to produce the individual's pain, then the second part of the analysis requires the ALJ to evaluate a claimant's statements about the intensity and persistence of the pain and the extent to which it affects the individual's ability to work.  Craig, 76 F.3d at 595.  The ALJ's evaluation must take into account "all the available evidence," including a credibility finding of the claimant's statements regarding the extent of the symptoms and the ALJ must provide specific reasons for the weight given to the individual's statements. Craig, 76 F.3d 595-96; SSR 96-7p, at 5-6, 11.

This Court must give great deference to the ALJ's credibility determinations.  See Eldeco, Inc. v. NLRB, 132 F.3d 1007, 1011 (4th Cir. 1997).  The Court of Appeals for the Fourth Circuit (as the immediate controlling appellate authority for this Court) has determined that "[w]hen factual findings rest upon credibility determinations, they should be accepted by the reviewing court absent 'exceptional circumstances.'" Id. (quoting NLRB v. Air Prods. & Chems., Inc., 717 F.2d 141, 145 (4th Cir. 1983)).  Therefore, this Court must accept the ALJ's factual findings and credibility determinations unless "'a credibility determination is unreasonable, contradicts other findings of fact, or is based on an inadequate reason or no reason at all.'" Id. (quoting NLRB v. McCullough Envtl. Servs., Inc., 5 F.3d 923, 928 (5th Cir. 1993)).

Furthermore, it is well established that Plaintiff's subjective allegations of pain are not, alone, conclusive evidence that Plaintiff is disabled.  See Mickles v. Shalala, 29 F.3d 918, 919 (4th Cir. 1994).  The Fourth Circuit has determined that "subjective claims of pain must be supported by objective medical evidence showing the existence of a medical impairment which

could reasonably be expected to produce the actual pain, in the amount and degree, alleged by the claimant." Craig, 76 F.3d at 591.

Here, the ALJ found that while Plaintiff's medically determinable impairments could reasonably be expected to produce his alleged symptoms, Plaintiff's statements concerning the intensity, persistence, and limiting effects of such symptoms were not credible to the extent that they were inconsistent with the RFC finding. (R. at 18.) The ALJ noted that written documentation of record reflected a greater level of activity than did Plaintiff's testimony. (R. at 18.) Such inconsistencies were noted to reflect "very poorly" on Plaintiff's overall credibility. (R. at 18.) The ALJ also noted that the medical evidence, as discussed earlier, did not corroborate Plaintiff's allegations of debilitating pain and limitations. (R. at 18-20.) Further, the ALJ noted that Plaintiff ceased working because the facility he worked at closed, not because of any impairment on his part. (R. at 20.)

At the hearing before the ALJ, Plaintiff testified that he lost his job when the plant he worked at closed, and that he collected unemployment compensation for approximately one and a half years.[12] (R. at 30.) He also testified that he drove six to seven times a week; he could only stand for five minutes because of lower back pain; he rested two to four hours a day because of his infirm back and legs; he had been on prescription pain medication for four months; he experienced dizziness which on occasion caused him to fall; he followed his prescribed diet but "cheat[s] … on Sundays"; he cannot breathe well; he smoked one pack a day and drank six beers a week; he had no sleeping problems; he did not go back to work because he "couldn't find a

---

[12] An individual must hold himself out as ready, willing, and able to accept employment if available to be eligible for unemployment benefits. See Myers v. Barnhart, 57 Fed. Appx. 990, 997 (3d Cir. 2003) (citing Johnson v. Chater, 108 F.3d 178, 180 (8th Cir. 1997)). A claim for such benefits is inconsistent with a claim for disability benefits, for which an individual must represent that he is unable to perform any SGA.

job"; and he cannot work following his heart attack in 2002. (R. at 29-30, 32-35, 37, 40-43, 47-49.) However, though at the hearing he denied performing any yard work or participating in any hobbies, in September 2007 Plaintiff reported that he did housework for one hour a week; mowed the law on a riding mower for three hours a week; and went fishing twenty times a year. (R. at 37-39, 153, 155.) The ALJ also noted Plaintiff's inconsistencies regarding the use of his 401(k) to pay for medical treatment. Plaintiff claimed to have used the 401(k) to pay for treatment in 2005 and had exhausted those funds by 2006, but the record reflects only two visits by Plaintiff to his cardiologist in 2005, and no visits to his primary care physician. (R. at 49-51.)

The above inconsistencies, as well as the lack of objective medical treatment evidence corroborating Plaintiff's allegations, serve as substantial evidence supporting the ALJ's decision to find Plaintiff not entirely credible. Accordingly, the ALJ's decision should be affirmed in that regard.

**B.     The ALJ's conclusion that there are other occupations which Plaintiff can perform is supported by substantial evidence and application of the correct legal standards.**

Once an ALJ determines a claimant's RFC, he may use the Medical Vocational Guidelines ("Grids") to determine the claimant's level of disability and potential for employment. Walker v. Bowen, 889 F.2d 47, 50 (4th Cir. 1989). The Grids categorize jobs by their physical-exertion requirements,[13] namely, sedentary,[14] light,[15] medium, heavy, and very heavy. See SSR

---

[13] A claimant's exertional limitations determines the proper exertional level for the claimant's situation. See SSR 83-10. An exertional limitation is an impairment-caused limitation which affects one's capability to perform an exertional activity (strength activity) such as sitting, standing, walking, lifting, carrying pushing, and pulling. SSR 83-10.

[14] Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. . . . Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met. 20 C.F.R. § 404.1567(a).

83-10.  There are numbered tables for the sedentary, light, and medium level (tables 1, 2, and 3, respectively), and a specific rule for the heavy and very heavy levels (Rule 204.00).  SSR 83-10; 20 C.F.R. Pt. 404, Subpt. P, App. 2.  Based on the claimant's RFC, the ALJ must first determine which table to apply, i.e., if the claimant's RFC limits him to a sedentary exertional level, then Table No. 1 is the appropriate table.  Next, based on the claimant's age, education, and previous work experience, the rule directs a finding of "disabled" or "not disabled."

Utilization of the Grids is predicated on the claimant suffering from exertional limitations, and the Grids are not applicable if the claimant suffers solely from nonexertional impairments.  20 C.F.R. § 404.1569a; see 20 C.F.R. Pt. 404, Subpt. P, App. 2, Table 1, § 200.01(e)(1) ("The rules do not direct factual conclusions of disabled or not disabled for individuals with solely nonexertional types of impairments.").  The reason for this rule is that nonexertional limitations may limit a claimant's ability to perform a full range of unskilled occupations at a given exertional level.  Thus, where a claimant suffers only exertional limitations, the ALJ must consult the Grids to determine eligibility for benefits.  See Walker v. Bowen, 889 F.2d 47, 49 (4th Cir. 1989); Cooper v. Sullivan, 880 F.2d 1152, 1155 (9th Cir. 1989).  At the same time, if a claimant suffers from both exertional and nonexertional limitations, then the ALJ must consult the Grids first to determine whether a rule directs a finding of disabled based on the strength requirement alone.  See 20 C.F.R. Pt. 404, Subpt. P, App. 2, Table 1, § 200.01(e)(2).  If the claimant is found to be disabled on the strength requirement alone (i.e., a claimant is limited to light work and meets the other categories in rule 202.01), then there is no need to examine the effects of the nonexertional limitations.  However,

_____

[15] Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to ten pounds. . . .  A job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.  20 C.F.R. § 404.1567(b).

if a rule directs a finding of "not disabled" based on the strength requirement (i.e., the claimant is limited to light work and meets one of the categories in rule 202.10), then the ALJ cannot utilize the Grids; instead, a VE must be utilized to take into account the effects of the claimant's nonexertional and exertional limitations and the claimant's RFC to determine whether there are jobs existing in significant numbers in the national economy that the claimant can perform. Walker, 889 F.2d 49-50.

It is important to note, however, that "not every nonexertional limitation or malady rises to the level of a nonexertional impairment, so as to preclude reliance on the grids." Walker, 889 F.2d at 49 (citing Grant v. Schweiker, 699 F.2d 189 (4th Cir. 1983)). The ALJ must inquire whether the nonexertional condition affects the claimant's RFC to perform work of which the claimant is exertionally capable. Id.

After finding that Plaintiff was capable of performing light work with some exceptions, and that Plaintiff could not perform his past relevant work as a press operator, the ALJ proceeded to step five to determine whether there were any other occupations that Plaintiff could perform. According to Grid Rule 202.18, Plaintiff would be found "not disabled" if he could perform the full range of light work. (R. at 20.) However, because the ALJ imposed additional restrictions on his RFC, the ALJ evaluated such restrictions to determine whether they had any effect on the occupational base of unskilled light work. (R. at 20.) The ALJ noted that bending and stooping were required only occasionally in light work; crouching was not required in light work; and restrictions against unprotected elevations and proximity to dangerous moving machinery were not significant at any exertional level. (R. at 21; SSR 83-14, SSR 85-15.) Accordingly, the ALJ found that such restrictions had little or no effect on the occupational base of unskilled light

work, and a finding of "not disabled" was appropriate. Because the ALJ properly analyzed the additional restrictions, the Court recommends that the ALJ's decision be affirmed.

## V. CONCLUSION

Based on the foregoing analysis, it is the recommendation of this Court that Plaintiff's motion for summary judgment (docket no. 9) be DENIED; that Defendant's motion for summary judgment (docket no. 13) be GRANTED; and, that the final decision of the Commissioner be AFFIRMED.

Let the Clerk forward a copy of this Report and Recommendation to the Honorable James R. Spencer and to all counsel of record.

## NOTICE TO PARTIES

**Failure to file written objections to the proposed findings, conclusions and recommendations of the Magistrate Judge contained in the foregoing report within fourteen (14) days after being served with a copy of this report may result in the waiver of any right to a *de novo* review of the determinations contained in the report and such failure shall bar you from attacking on appeal the findings and conclusions accepted and adopted by the District Judge except upon grounds of plain error.**

                                    _____/s/_____
                                    DENNIS W. DOHNAL
                                    UNITED STATES MAGISTRATE JUDGE

Date: April 5, 2011
Richmond, Virginia